

FILED

FEB 3 2015

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            7H            DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br>vs.<br><br>GEORGE GARIBAY (8),<br><br>                              Defendant. | CASE NO. 13cr4514-BEN<br><br>ORDER DENYING<br>MOTION TO SUPPRESS<br>[Dkt. No. 182] |

Now before the Court is Defendant's motion to suppress all wire and electronic surveillance evidence (filed December 2, 2014). Defendant's motion to suppress is denied.[1]

## BACKGROUND

According to the Government, in the spring of 2012, a law enforcement task force began investigating a conspiracy to distribute methamphetamine and collect "tax" money from drug dealers that operated with associates both inside and outside state and local detention and prison custodial facilities. As a result of the investigation, approximately 70 individuals have been charged. During the investigation, a number of wiretap orders were applied for and issued by judges in

---

[1] Defendant also makes arguments related to minimization. Those arguments are not addressed in this order. Minimization motions will be heard later.

this and other United States District Courts.  According to the Indictment, Garibay was not incarcerated at the time of the investigation, but he may have been communicating telephonically to associates that were incarcerated.

Defendant now seeks to suppress evidence of telephone conversations between himself and others.  According to the motion, Defendant's communications were captured on target telephones #1, 2, 3, 4, 5, 6, and 7.  He seeks to suppress the interceptions obtained by wiretap orders dated July 24, 2012 and August 23, 2012. All nine wiretap orders in this district were issued by United States District Judges Hon. Irma E. Gonzalez and Thomas J. Whelan.  Defendant does not identify a particular interception for which he seeks suppression.  The Government does not contest Defendant's *standing* to challenge the admissibility of wiretap evidence.

## I.     THE FOURTH AMENDMENT DOES NOT PROTECT CELLULAR TELEPHONE COMMUNICATIONS BY A PRISONER

Defendant does not argue a Fourth Amendment right to suppression of his telephone conversations.  He relies, instead, on the wiretap statute.  Nevertheless, it is important to note that in most cases the  Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Its protection extends to telephone conversations and requires the government to obtain a warrant before electronically eavesdropping.

However, the protection applies only if a person has a reasonable expectation of privacy in not having his words or conversation overheard.  *See Katz v. United States*, 389 U.S. 347 (1967).  No court has ruled that a prison inmate (or a person communicating by telephone with an inmate) has a reasonable expectation of privacy for communications the inmate makes by cellular telephone.  Defendant cites no case.  Indeed, the United States Supreme Court decided that the Fourth Amendment proscription against unreasonable searches does not apply to a person within the walls of the prison cell.  *See Hudson v. Palmer*, 468 U.S. 517, 525-26

- 2 -

1   (1984) ("[W]e hold that society is not prepared to recognize as legitimate any

2   subjective expectation of privacy that a prisoner might have in his prison cell and

3   that, accordingly, the Fourth Amendment proscription against unreasonable

4   searches does not apply within the confines of the prison cell.  The recognition of

5   privacy rights for prisoners in their individual cells simply cannot be reconciled

6   with the concept of incarceration and the needs and objectives of penal

7   institutions.").

8        Under *Palmer*, Defendant may have no Fourth Amendment right to privacy

9   while communicating with an incarcerated person.

10

11   **II.   A COMMUNICATION THROUGH USE OF A CONTRABAND CELL**

       **PHONE BY A PRISONER IS NOT COVERED BY 18 U.S.C. § 2518**

12          **("TITLE III")**

13        Defendant argues that the wiretap application supporting each wiretap order,

14   which led to the interception of his cellular telephone communications, did not

15   satisfy Title III.  *See* Title III of the Omnibus Crime Control and Safe Streets Act of

16   1968, 18 U.S.C. §§ 2510 *et seq.* ("The Wiretap Act" or "Title III").  As a general

17   matter, Title III prohibits electronic surveillance by the federal government except

18   under defined circumstances.  The Act also provides for suppression of evidence in

19   three instances enumerated in 18 U.S.C. § 2518(10)(a).  Defendant explicitly relies

20   on (i) and (ii) of § 2518(10)(a) to suppress.

21        Whether Title III applies to cellular telephone communications by or between

22   prison inmates is a question of first impression.  Title III was enacted in 1968,

23   before the invention of the cellular telephone.  It was enacted to protect the Fourth

24   Amendment right to privacy for telephone conversations (as recognized in *Katz v.*

25   *United States*, 389 U.S. 347 (1967)).  *See Gelbard v. United States*, 408 U.S. 41, 47

26   (1972) (legislative history is clear that Congress was concerned about

27   "safeguard[ing] the privacy of innocent persons."); *see also United States v.*

28   *Forrester*, 616 F.3d 929, 945 (9th Cir. 2010) ("Supreme Court has routinely

acknowledged that § 2518 . . . was enacted specifically to meet the constitutional requirements for electronic surveillance enunciated by the Supreme Court in *Berger* [*v. New York*] and *Katz v. United States.*").  While there have been more recent amendments, Title III still does not specifically mention cellular telephones.

The Ninth Circuit has acknowledged that a conventional wiretap order may apply to a cellular telephone in ordinary circumstances, and that a "roving wiretap" order is not required for a cell phone even though a cell phone has no fixed location. *See United States v. Oliva*, 705 F.3d 390, 400-01 & n.4 (9th Cir. 2012) ("As noted earlier, under Title III, the district court may authorize a standard intercept of communications over a land line or cellular telephone only if the government's application includes 'a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted.' § 2518(1)(b)(ii)."); *see also United States v. Goodwin*, 141 F.3d 394, 403 (2nd Cir. 1997) (assuming that Title III applies to cellular telephones and deciding that for a cellular telephone, the Government did not need to obtain a "roving wiretap.").  But no court has addressed the applicability of Title III to a cellular telephone being used by a prisoner.

And no court has considered the impact of Congressional action in 2010 defining a mobile phone to be contraband for federal prisoners. *See* Cell Phone Contraband Act of 2010,  P. L. 111-225 [S 1749], August 10, 2010 (amending 18 U.S.C. § 1791); *see also* Statement by Senator Feinstein, 155 Cong. Rec. S10112-01, 2009 WL 3171677 ("This bill would close this loophole by defining cell phones as contraband material under Federal law.  As a result, any person smuggling or in possession of a cell phone could potentially serve up to a year in prison.  A cell phone should never be in the hands of a prisoner.  The presence of these cell phones poses a grave safety concern for staff, inmates, and the public.  We know that inmates use these phones to conduct criminal business outside of prison walls, including directing gang hits, controlling drug trafficking operations and even

- 4 -

1   conducting credit card fraud.").

2        Since the 2010 amendment to 18 U.S.C. § 1791, it has been unlawful for a
3   prisoner in a federal prison to possess or use a cell phone. *See* § 1791(d)(1)(F)
4   defining a prohibited object as "a phone or other device used by a user of
5   commercial mobile service. . . ." A Westlaw search found only two unpublished
6   cases involving violations of the Cell Phone Contraband Act. *See United States v.*
7   *Drakes*, __Fed. App'x. __, 2014 WL 6676994 (11th Cir. Nov. 26, 2014) (reviewing
8   sentence of former federal prison guard convicted of smuggling seven cell phones
9   into prison for resale to inmates.); *United States v. Gadsden*, Case No 09-305, slip
10  op., 2012 WL 4973412 (W.D. Pa. Oct. 17, 2012) (pretrial order denying severance
11  of counts with one count alleging possession of a prohibited object (a cellular
12  telephone) in violation of § 1791(b)(4)). Neither case considered whether the
13  Wiretap Act applied to conversations by inmates using contraband cellular
14  telephones.

15       This Court finds that Congress created an implicit exception to the
16  requirements of Title III. Title III does not apply to the interception by law
17  enforcement officers of a telephone communication from a prisoner using a
18  contraband cellular telephone. *Cf. Mitchum v. Foster,* 407 U.S. 225, 235 (1972)
19  (describing numerous implied exceptions to the anti-injunction statute (28 U.S.C.
20  § 2283)); *Feres v. United States*, 340 U.S. 135 (1950) (finding an implied exception
21  to the Federal Tort Claims Act for injuries to servicemen where the injuries are
22  incident to service); *McMellon v. United States*, 387 F.3d 329, 349 (4th Cir. 2004)
23  (holding recent Suits in Admiralty Act (46 U.S.C. App. §§741-52) must be read to
24  include an implied discretionary function exception to its waiver of sovereign
25  immunity, as in the older Federal Tort Claims Act).

26       Passage of the Cell Phone Contraband Act makes clear that Congress
27  considered it dangerous for an inmate to possess a cellular telephone. The potential
28  for criminality is large. In this case, the allegations of the indictment (if true) aptly

- 5 -

illustrate some of the dangers: orchestrating assaults on other inmates, planning contraband drug sales within the prison, ordering the transfer of drug proceeds in outside accounts, surveillance of other inmates, carrying out a criminal conspiracy, and doing all of the above while avoiding detection by prison guards. And the use of smuggled cellular telephones by prison inmates has become a large national problem.

> In federal institutions and prison camps, GAO reports that the number of cell phones confiscated by the Federal Bureau of Prisons (BOP) grew from 1,774 in 2008 to 3,684 in 2010. While not all states track or report data on the use of contraband wireless devices, the data that has been reported demonstrates significant growth. For example, California correctional officers seized approximately 261 cell phones in 2006; by 2011, correctional officers discovered more than 15,000 contraband wireless devices. Further, a test of an interdiction technology in two California State prisons detected more than 25,000 unauthorized communication attempts over an 11 day period in 2011. A similar interdiction system permanently installed in a Mississippi correctional facility reportedly blocked 325,000 communications attempts in the first month of operation, and as of February 2012, had blocked more than 2 million communications attempts.

*Promoting Technological Solutions to Combat Contraband Wireless Device Use in Corr. Facilities*, F.C.C. Notice of Proposed Rulemaking, 28 F.C.C. Rcd. 6603, 6607 2013 WL 1855953 *3 (2013); *see also* E. Fitzgerald, *CELL "BLOCK" SILENCE: WHY CONTRABAND CELLULAR TELEPHONE USE IN PRISONS WARRANTS FEDERAL LEGISLATION TO ALLOW JAMMING TECHNOLOGY*, 2010 Wis. L. Rev. 1269, 1276-77 (citations omitted).[2]

---

[2] Fitzgerald writes:
> Cell phone smuggling is difficult to prevent because the devices are brought into correctional facilities in a myriad of ways. Inmates coordinate smuggling efforts with corrupt correctional facility workers, visiting family members, or fellow gang members. Smugglers often throw handsets over facility walls or conceal them in packages sent to the prisons. One facility in Texas reported finding seventy-five cell phones hidden in an air compressor. Smugglers opened the metal tank, hid the phones and chargers with some narcotics, and then welded the tank shut. Officials found the phones when drug-sniffing dogs detected the

1    It would be an ironic interpretation of the law to find that a prison inmate,

2  who by virtue of his initial crime and conviction, when he is placed in a cellblock

3  where he has *no* Fourth Amendment rights, and when he commits a further crime by

4  obtaining and using a contraband cellular telephone, acquires a statutory right under

5  Title III to be free from law enforcement eavesdropping, unless a Title III wiretap

6  order is first obtained.  An inmate's argument would have to be that, even if he does

7  not hold a constitutional right to privacy for his contraband telephone

8  communications, he enjoys a statutory right to suppression under Title III.  His

9  implicit argument maintains that he has a statutory right to illicitly use a contraband

10  cellular phone to communicate with others about a criminal conspiracy, and he

11  enjoys protection from those communications being recorded and admitted against

12  him in court, unless a valid wiretap order was in place.[3]  This cannot be what

13  Congress intended.

14    It must be the case that Congress intended to except from the purview of Title

15

---

16    narcotics.  The San Francisco Chronicle reported that "more than half the
phones in prisons come from staff at the facilities - including guards,

17  cooks, [and] health care workers."  Correctional facility staff is familiar
with the facilities in which they work, and, in some cases, undergo less

18  stringent security requirements than visitors.  In 2009, 300 California
correctional employees were disciplined for suspected cell phone

19  smuggling.  150 more have been disciplined in 2010.  One California
correctional officer told officials that he made more than $100,000 in one

20  year by smuggling cell phones.  Since 2007, 230 Texas correctional
facility employees have been disciplined for "cell phone-related

21  infractions."  Family members are also often culprits.  Richard Tabler's
mother and sister allegedly assisted him in procuring the cellular phone

22  he used to call Senator Whitmire.  They were later indicted on charges of
assisting an inmate to obtain a contraband cell phone.  The cost to procure

23  a cell phone on the black market varies widely depending on prison
location and an inmate's level of security, but is within reach for criminals

24  continuing to engage in profitable criminal enterprises.  On the high end,
Texas death row inmate Tabler paid $2100 for his contraband cell phone.

25   California officials note that contraband cell phones can be purchased for
between $100 and $400 each.  Family or gang members often cover the

26  initial financial outlay and subscription rates.

27    [3]It makes no difference that Defendant was an inmate in a California state or

28  local facility, rather than a federal prison, because California law also treats possession
and use of a cellular phone by an inmate as a misdemeanor crime.  *See* Cal. Penal Code
§§ 4575 & 4576.

III's law enforcement restrictions, the interception of contraband cellular telephone communications from or to an inmate within a jail or prison. Therefore, because Title III implicitly excepts law enforcement officers from the need to obtain a wiretap order before intercepting or recording an inmate's contraband cell phone communications, Defendant's motion to suppress such recordings under Title III is denied.

### III. ALTERNATIVELY, THE DECISION OF THE DISTRICT JUDGE ISSUING A WIRETAP ORDER IS ENTITLED TO DEFERENCE FROM ANOTHER DISTRICT JUDGE CONSIDERING A MOTION TO SUPPRESS

When a United States District Judge reviews a Title III wiretap application and concludes that law enforcement has made a proper case and issues a wiretap order, that decision is accorded a measure of deference by the court of appeals. *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2008) ("[W]e may not reverse simply because we might have decided not to grant the wiretap. We review the issuing court's decision to grant the wiretap for an abuse of discretion."); *United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006) (en banc) ("[T]he conclusion that the wiretap was necessary in each situation is reviewed for abuse of discretion."); *United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004) ("The issuing judge's decision that the wiretap was necessary is reviewed under an abuse of discretion standard."). The correct standard of review for a district court to use when judging a motion to suppress, however, has not been identified by the parties and the Ninth Circuit has not directly addressed the question.

Some district courts have implicitly reviewed wiretap orders *de novo*. Other district courts have applied an abuse of discretion standard. *See United States v. Yim*, No. CR11-131-MJP, 2012 WL 395791 *5 (W.D. Wash. Feb 7, 2012) (citations omitted) ("Defendants argue that the Court should apply a de novo review to the showing of necessity. Defendants cite no case that stands for that proposition, but

urge the Court to do so because this is the first time the allegations as to necessity are subjected to an adversarial challenge.  The Court is not persuaded by this argument, given the fact this Court sits in the same position as the Ninth Circuit when reviewing an affidavit's showing of necessity.  Both before this Court and the Ninth Circuit, the warrant has issued, the arrests have been made, and the adversarial process commenced.  Prior to that, it is up to the reviewing judge to use her discretion to gauge whether the affidavit sustains a showing of necessity and that determination is entitled to deference under an abuse of discretion standard. The Court thus applies the abuse of discretion standard in analyzing the issue of necessity."); *United States v. Velarde-Ozuna*, No. CR10-754-TUC-CKJ, 2011 WL5007918 *2 (D. Ariz. Oct. 20, 2011) ("An appellate court reviews an 'issuing judge's decision that the wiretaps were necessary for an abuse of discretion.'  A district court evaluating a wiretap authorization in order to resolve a suppression motion applies the same standard of review."); *United States v. Ai Le*, 255 F. Supp. 2d 1132, 1134 (E.D. Cal. 2003) (citations omitted) ("[A] court reviewing a wiretap authorization must use an abuse of discretion standard.").  These decisions are better reasoned and persuasive.  Consequently, this Court will not suppress wiretap evidence simply because it might have adjudged the wiretap application differently than did an issuing judge.  The decision to issue a wiretap order will be accorded a measure of deference.  Only if there is a clear and convincing case made that the wiretap order was the result of the issuing judge's abuse of discretion, will this Court grant a motion to suppress.

Defendant makes no argument that the judge who issued the wiretap order in this case in any way abused her discretion.  She had the lengthy wiretap application and the application arguably supported the order.  She could arguably find probable cause to believe a crime was being committed.  She could arguably find that other investigative tools had been tried and a wiretap was necessary to extirpate the criminal conspiracy.  She could arguably find that the wiretap request was

sufficiently confined. In short, Defendant has identified no reason, and this Court finds there is no reason, to conclude that the issuing judge's decision is not entitled to deference. Defendant's argument now, that the wiretap order should not have been issued because the application was deficient, without much more, is foreclosed. Therefore, the motion to suppress is denied.

## IV.   ALTERNATIVELY, THE GOVERNMENT MADE A SUFFICIENT SHOWING OF NECESSITY IN THE WIRETAP APPLICATION

Assuming for the sake of argument, that one person communicating with another person using a contraband cell phone while incarcerated has a constitutional or statutory right to suppress evidence gained in violation of Title III, and assuming for the sake of argument that no deference is to be given the decision of the wiretap-issuing district judge, Defendant has still failed to carry his burden of proving a wiretap order was defective.

The Wiretap Act provides three grounds upon which evidence derived from a wiretap may be suppressed. First, it may be proven that, "the communication was unlawfully intercepted." *See* 18 U.S.C. 2518(10)(a)(i). Second, it may be proven that, "the order or authorization or approval under which it was intercepted is insufficient on its face." *See* 18 U.S.C. 2518(10)(a)(ii). Third, it may be proven that, "the interception was not made in conformity with the order of authorization or approval." *See* 18 U.S.C. 2518(10)(a)(iii). Defendant relies on the first two reasons for suppression.

### A. Delegated Authority

Defendant argues that the wiretap orders were insufficient on their face and moves to suppress under § 2518(10)(a)(ii). He argues that, "the identity of the persons who bore the responsibility for approval of the wire applications was not clearly set out." But this is inaccurate. The July 2012 application is signed by Ms. Mary Patrice Brown, Deputy Assistant Attorney General, Criminal Division. The

August 2012 application is signed by Mr. Jason M. Weinstein, Deputy Assistant Attorney General, Criminal Division.  Both of these officials were delegated authority from the Attorney General and are sufficient under the Title III's provisions.

**B. Necessity**

Defendant makes several arguments as to the lacking of necessity for the wiretap orders.  Without a showing of necessity for a wiretap order, wiretap evidence may suppressed because "the communication was unlawfully intercepted." 18 U.S.C. 2518(10)(a)(i).

When a court is reviewing "necessity," the Ninth Circuit has adopted a "common sense approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1228 (9th Cir. 2009) (citations and internal quotations omitted).  When investigating a criminal conspiracy, the government is given "more leeway in its investigative methods.." *Id.* at 1230.  "Like the Hydra of Greek Mythology . . . the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed." *Id.* (quoting *United States v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002).  This is because, the Ninth Circuit has observed, "it is one of the first duties of every government to extirpate gangs of thieves." *Id.*

### *1. Broad Goals of the Investigation*

Defendant first argues that the goal of the investigation was overbroad, thus manufacturing artificial necessity.  He argues, "[t]his goal is as open ended as could be imagined.  Its goal is to gain 'insight' which on its face defeats the limitations dictated by the statute and case law."  However, the goal stated in the wiretap application is not simply to "gain insight."  Though broad, the goal of the investigation is more defined and circumscribed as described in paragraph 26 of the

- 11 -

1    July 2012 application.

2         The Ninth Circuit has approved in other cases similarly broad investigative
3    goals in drug smuggling conspiracies. *See Canales Gomez*, 358 F.3d at 1224;
4    *United States v. Shryock*, 342 F.3d 948, 975-76 (9th Cir. 2003); *see also United*
5    *States v. Chan*, No. C 05-375 SI, 2006 WL 1581946*6 (N.D. Cal. June 6, 2006)
6    (denying motion to suppress wiretap evidence where investigatory goals of
7    identifying conspirators and methods were very broad.). Defendant notes that the
8    government may not adopt investigatory goals "so far and so wide" that the goals
9    can be seen as "manufactur[ing] necessity in all circumstances." *United States v.*
10   *Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2000). In *Blackmon,* the principal
11   problem was that the Title III application contained material omissions and
12   misstatements. When "purged of these misstatements . . . the remainder of the
13   application, which contain[ed] generalized statements that would be true of any
14   narcotics investigation, fail[ed] to contain sufficiently specific facts to satisfy the
15   requirements of § 2518(1)(c)." *Id.* In this case, the government did not cast its net
16   so far and so wide as to have manufactured necessity in every circumstance.
17   Instead, it adopted an investigatory goal that was limited to a narcotics distribution
18   and taxation conspiracy operated inside and outside California Prisons and jails in
19   San Diego County. The applications in this case do not have the same flaws as the
20   *Blackmon* application.

21                   **2. *Omissions in the Affidavit***

22        Defendant argues that the applications lack a full and complete statement of
23   the facts concerning all previous applications. He suggests, but does not identify,
24   any omitted facts. A defendant seeking suppression on the basis of a misstatement
25   or omission must satisfy several requirements, including a detailed offer of proof
26   and an affidavit, before going forward under *Franks v. Delaware*, 43 U.S. 154, 155-
27   56 (1978). *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (listing five
28   requirements for a *Franks* hearing); *United States v. Gutierrez*, No. 12CR236-IEG,

2012 WL 6624769*1-4 (S.D. Cal. Dec. 19, 2012) (describing requirements for *Franks* hearing for wiretaps). Defendant has not satisfied these requirements.

## V.   CONCLUSION

Defendant's motion to suppress wiretap evidence is denied.

DATED: 2/2/15

Hon. Roger T. Benitez
United States District Judge

- 13 -